UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-8226-BER

UNITED STATES OF AMERICA

v.

ANWAR HAZZI,

Defendant             /

FILED BY ___SP___ D.C.

May 16, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)? No.

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? No.

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No.

4. Did this matter involve the participation of or consultation now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: _____
Brian D. Ralston
Assistant United States Attorney
Court ID No.: A5502727
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Telephone: (561) 209-1068
Email: Brian.Ralston@usdoj.gov

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

United States of America
v.
ANWAR HAZZI

*Defendant(s)*

Case No. 24-8226-BER

FILED BY **SP** D.C.
**May 16, 2024**
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of January 30, 2024-May 15, 2024 in the county of Palm Beach in the
Southern District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance (methamphetamine, cocaine, fentanyl) |

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Bradley Freimuth, DEA
*Printed name and title*

Sworn and attested to me in my presence.

Date: 5/16/24

*Judge's signature*

City and state: West Palm Beach, Florida

Bruce E. Reinhart, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Bradley Freimuth, being duly sworn, depose and state as follows:

### AGENT BACKGROUND AND PURPOSE OF AFFIDAVIT

1.  I am a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Miami, Florida Field Division, West Palm Beach District Office, and have been so employed since April of 2023. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1). I have received training on the subject of narcotics trafficking and money laundering from the DEA and have been personally involved in investigations concerning the possession, manufacture, distribution, transportation and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds.

2.  Prior to my assignment with the DEA, I was a narcotics detective and a SWAT operator with the Highlands County Sheriff's Office (HCSO) in Highlands County, FL. In the course of my 6-year career at HCSO, I participated in numerous narcotics investigations in which I conducted physical and electronic surveillance, drafted and executed search warrants, and reviewed and analyzed recorded conversations and documents seized from drug traffickers. Through my training, education, and experience, which included debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, and investigating and conducting surveillance on numerous occasions of individuals engaged in drug trafficking, I became familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, the efforts of persons involved in such activity to avoid detection by law enforcement, as well as methods used to finance drug transactions and thereafter launder drug proceeds.

3.  As a SA with the DEA, I have conducted investigations of, and have been instructed

1

in investigative techniques concerning the unlawful distribution of illegal narcotics, possession with intent to distribute controlled substances, importation of illegal narcotics, use of communication facilities to conduct illegal narcotics transactions, maintaining places for purposes of manufacturing, distributing or using controlled substances and conspiracies to commit these offenses, in violation of Title 21, United States Code Sections 841(a)(1), 843(b), 856, 846, 952, and 963, respectively. Based upon this experience, and through the experience of other agents and detectives with numerous years of experience, I have also become well versed in the methodology utilized in illegal narcotics trafficking, the specific type of language used by illegal narcotics traffickers, and the unique patterns employed by narcotics organizations. I have also participated in surveillances, electronic surveillances, and wire surveillances. Additionally, I have arrested individuals for various drug violations and have spoken with a number of drug dealers, drug users, and informants concerning the methods and practices of drug traffickers. As a result of my law enforcement experiences, and the experience of other agents and detectives I have worked with in dealing with drug traffickers, I have found that they rarely speak openly about their illegal narcotics transactions. Instead, they use coded language to disguise their conversations about illegal narcotics transactions and also communicate via text messages.

    4.  This affidavit is submitted in support of a criminal complaint charging Anwar HAZZI with Conspiracy to Distribute a Controlled Substance, fentanyl, cocaine, and methamphetamine, in violation of Title 21, United States Code, Section 846. The information contained in this affidavit is based on information provided to me from other law enforcement officers and agents, a review of law enforcement reports, and my own personal knowledge. This affidavit is submitted for the limited purpose of establishing probable cause. It does not purport to describe everything known to me concerning the investigation.

## PROBABLE CAUSE

5.      In or about January 2024, the Palm Beach County Sheriff's Office (PBSO) and the DEA West Palm Beach District Office (WPBDO) began a joint investigation into the drug trafficking activities of Confidential Source ("CS2"). Information from a confidential source ("CS1") indicated that CS2 and his associates were operating a pill press and using it to manufacture pills resembling Adderall, but containing methamphetamine, which CS2 then sold in the Southeast Florida area. According to CS1, CS2's organization also sold cocaine and pressed pills resembling Oxycodone that contained fentanyl. CS1 agreed to introduce an undercover agent to CS2 and a PBSO Undercover (UC) Agent then met and began purchasing controlled substances from CS2.

### Controlled Purchase of Pressed Adderall Containing Methamphetamine on January 31, 2024

6.      On January 30, 2024, CS1, under the direction of the UC, contacted CS2 via Telegram App, a secure instant messaging application. CS1 arranged for the UC to purchase 1,000 pressed pills designed to resemble Adderall 30 mg pills, but believed to contain methamphetamine per information from CS1, from CS2 for a price of $2,000. The deal was to occur the following day and was originally set to occur in Boca Raton, FL, but the location was later moved to the WaWa gas station located at 1965 Hypoluxo Rd, Lake Worth, FL.

7.      On January 31, 2024, at approximately 3:45 p.m., the UC contacted CS1 and had CS1 confirm with CS2 via the Telegram app that CS2 was on his way to the deal location with the pressed pills, which CS2 did. At approximately 4:42 p.m., the UC arrived at the WaWa gas station. At approximately 4:57 p.m., CS2 arrived at the gas station in a white Toyota Highlander SUV. A few moments after his arrival, CS2 exited his vehicle and entered the front passenger seat of the UC's vehicle. After a few moments of conversation, CS2 removed a vacuum-sealed bag from underneath his jacket that contained a large quantity of orange circular pills labeled "30" on one side and "dp" on the other and handed it to the UC. The appearance of the pills was consistent with the appearance

of Adderall 30 mg pills. The UC then handed CS2 the $2,000 in DEA Official Advanced Funds (OAF), which CS2 immediately counted. At approximately 5:04 p.m., the transaction concluded and CS2 reentered his vehicle and departed the target location.

8. This UC purchase was audio and video recorded. The DEA Southeast Laboratory later performed a chemical analysis of the pills purchased during the operation and verified that they contained methamphetamine. The net weight of the pills was approximately 388.3 grams.

**Controlled Purchase of Pressed Adderall Containing Methamphetamine on February 13, 2024**

9. On February 12, 2024, the UC contacted CS2 via Telegram and arranged to purchase another 1,000 pressed pills designed to resemble Adderall 30 mg from CS2 for a price of $2,000. The deal was to occur the following day in the parking lot of the Denny's restaurant at 1311 W Palmetto Park Rd, Boca Raton, FL.

10. On February 13, 2024, at approximately 11:45 a.m., the UC confirmed with CS2 via the Telegram app that CS2 was on his way to the deal location with the pressed pills. At approximately 12:04 p.m., the UC arrived at the Denny's restaurant parking lot. At approximately 12:05 p.m., CS2 arrived at the target location in a tan Lincoln sedan. CS2 then exited his vehicle and entered the front passenger seat of the UC's vehicle. After a few moments of conversation, CS2 handed the UC a vacuum-sealed bag that contained a large quantity of orange circular pills labeled "30" on one side and "dp" on the other. The appearance of the pills was consistent with the appearance of Adderall 30 mg pills. The UC then handed CS2 the $2,000 in OAF, which CS2 put into his pocket, while saying to CS2, "they look clean." The UC then asked CS2 if he was purchasing the pills in bulk or "pressing them," meaning using a pill press machine to manufacture them. CS2 responded that he made them. CS2 also stated that he had about 40,000 more pills to sell. At approximately 12:09 p.m., the transaction concluded and CS2 reentered his vehicle and departed the deal location.

11. This UC purchase was audio and video recorded. The DEA Southeast Laboratory later

performed a chemical analysis of the pills purchased during the operation and verified that they contained methamphetamine. The net weight of the pills was approximately 391.1 grams.

**Controlled Purchase of Pressed Oxycodone Containing Fentanyl on March 20, 2024**

12.     On March 20, 2024, at approximately 11:40 a.m., the UC contacted CS2 via the Telegram App and arranged to meet with CS2 later in the day for the purpose of purchasing counterfeit pressed pills that were designed to resemble Oxycodone, but were suspected to contain fentanyl based on information obtained from CS1. The UC and CS2 agreed to meet in the parking lot of the Denny's restaurant located at 1311 W. Palmetto Park Road, Boca Raton, Florida, at approximately 2:00 p.m.

13.     Upon CS2's arrival at approximately 2:20 p.m., he exited his newly leased and registered vehicle, a black 2024 Honda Civic bearing Florida license plate #51ELDC, and entered the UC's vehicle. Once inside the UC vehicle, CS2 handed the UC a plastic Ziplock-style bag that contained approximately 200 white circular pills labeled "10" on one side and "R/P" on the other. The appearance of the pills was consistent with the appearance of Oxycodone 10 mg pills. The UC then handed CS2 $2,000 in DEA OAF. During the conversation, the UC told CS2 in reference to the pills, "Wow these came out good," meaning the pills were pressed well. CS2 responded saying, "Yeah, I got a lot of them too." CS2 told the UC that he (CS2) had about 4,000 of the pressed Oxycodone pills left, as well as a large quantity of the pressed Adderall pills the UC had purchased from CS2 during the previous deals outlined above. At the conclusion of the deal, CS2 reentered his vehicle and returned to Miami.

14.     This UC purchase was audio and video recorded. The pills purchased on this date had a net weight of approximately 24.2 grams. The results of a chemical analysis of the pills at the DEA Southeast Laboratory later confirmed that they contained fentanyl.

**Controlled Purchase of Pressed Oxycodone Containing Fentanyl on March 22, 2024**

15. On March 22, 2024, at approximately 11:03 a.m., the UC contacted CS2 via the Telegram App to arrange to meet with CS2 later in the day for the purpose of purchasing another 200 of the same counterfeit Oxycodone pills purchased during the previous deal on March 20, 2024. At approximately 12:32 p.m., CS2 responded via the Telegram App. The UC and CS2 agreed to meet in the parking lot of the Denny's restaurant located at 1311 W. Palmetto Park Road, Boca Raton, Florida, at approximately 2:30 p.m.

16. Upon CS2's arrival, he exited his vehicle and entered the UC's vehicle. Once inside the UC vehicle, CS2 handed the UC a plastic Ziplock-style bag that contained approximately 200 white circular pills labeled "10" on one side and "R/P" on the other. The appearance of the pills was consistent with the appearance of Oxycodone 10 mg pills. The UC then handed CS2 $2,000 in DEA OAF. At the conclusion of the deal, CS2 reentered his vehicle and returned to Miami.

17. This UC purchase was audio and video recorded. The pills purchased on this date had a net weight of approximately 21.5 grams. The results of a chemical analysis of the pills at the DEA Southeast Laboratory later confirmed that they contained fentanyl.

**Controlled Purchase of Pressed Oxycodone Containing Fentanyl on April 4, 2024**

18. On April 4, 2024, at approximately 11:22 a.m., the UC contacted CS2 via the Telegram App to arrange a purchase of crystal methamphetamine. CS2 then contacted his source and replied to the UC shortly thereafter that his source could not supply the crystal methamphetamine. The UC then attempted to arrange a purchase of 500 pressed Oxycodone pills. At approximately 12:22 p.m., CS2 replied to the UC that he only had 300 of the pills left, but would sell them to the UC for $3,000.

19. Upon CS2's arrival at approximately 1:53 p.m., he exited his vehicle and entered the UC's vehicle. Once inside the UC vehicle, CS2 handed the UC a plastic Ziplock-style bag that contained approximately 300 white circular pills. The UC then handed CS2 $3,000 in DEA OAF. The UC and CS2 then discussed CS2's use of cryptocurrency and the prospect of the UC using

cryptocurrency to make future purchases from CS2. CS2 told the UC that he invested heavily in Bitcoin and that he accepted Bitcoin as a form of payment in drug transactions with other buyers. CS2 told the UC that he might be willing to allow the UC to use Bitcoin for future purchases. At the conclusion of the deal, CS2 reentered his vehicle and returned to Miami.

20. This UC purchase was audio and video recorded. The pills purchased on this date had a net weight of approximately 32.2 grams. The results of a chemical analysis of the pills at the DEA Southeast Laboratory later confirmed that they contained fentanyl.

### Controlled Purchase of Pressed Oxycodone Containing Fentanyl and Pressed Adderall Containing Methamphetamine on May 1, 2024

21. On May 1, 2024, at approximately 11:23 a.m., the UC contacted CS2 via the Telegram App to arrange a purchase of 1,500 pressed pills resembling Adderall, but believed to contain methamphetamine, and 300 pressed pills resembling Oxycodone 10 mg, but believed to contain fentanyl. CS2 replied that he was "handling something else at the moment," but would be able to meet the UC at the Denny's Restaurant in Boca Raton at around 2:00 p.m.

22. Upon CS2's arrival at approximately 4:46 p.m., he exited his vehicle and entered the UC's vehicle. Once inside the UC vehicle, CS2 handed the UC a red Cream of Wheat box within which there were 2 vacuum-sealed plastic bags containing pressed pills and a Ziplock-style bag containing pressed pills. Within the two vacuum-sealed bags were approximately 1,500 orange circular pills marked "30" on one side and "dp" on the other. Within the Ziplock-style bag were approximately 300 white circular pills marked "10" on one side and "R/P" on the other. The UC then handed CS2 $6,000 in DEA OAF, which CS2 placed in his pants pocket.

23. This UC purchase was audio and video recorded. The pressed Oxycodone pills purchased on this date had a packaged weight of approximately 122.2 gross grams and the pressed Adderall pills had a packaged weight of approximately 618.5 gross grams. The results of chemical analyses of the pills at the DEA Southeast Laboratory are pending.

## CS Cooperation in the Investigation of Anwar HAZZI Resulting in HAZZI's Arrest on May 15, 2024

24. On May 15, 2024, the UC arranged another controlled purchase from CS2 for approximately 1,000 pressed Adderall pills believed to contain methamphetamine and approximately 1,000 pressed Oxycodone pills believed to contain fentanyl in Boca Raton, FL. When CS2 arrived at the deal location, agents detained and interviewed CS2, and seized the pressed pills. During the recorded post-Miranda interview of CS2, CS2 stated that CS2 had a partner at whose direction CS2 had been involved in drug trafficking for approximately a year and-a-half. CS2 identified the partner as Anwar HAZZI. CS2 stated that during that timeframe, HAZZI had provided CS2 on many occasions with large quantities of pressed Adderall pills, pressed Oxycodone pills, and cocaine to sell. CS2 stated that CS2 had conducted every one of the above-described drug transactions with the UC using narcotics provided by HAZZI, and that after every one of said transactions, CS2 had given HAZZI the cash that the UC had given CS2 in payment for the narcotics.

25. CS2 also stated during the interview that HAZZI had recently directed CS2 to rent a storage unit and store a large quantity of narcotics belonging to HAZZI within the storage unit. CS2 provided agents with the location of the storage unit, an electronic code with which to gain entry to the storage facility, and the key to the storage unit door and the key to the container within the storage unit that stored HAZZI's narcotics. The location of the unit was the Sentry Self Storage, 3300 NE 2nd Ave, Miami, FL 33137, unit #7492. CS2 then signed a written Consent to Search form allowing agents to enter and search the storage unit and the container within it. When agents searched the container within the storage unit, they found and seized approximately 4 kilograms of suspected cocaine and several thousand pressed pills resembling Adderall that are suspected to contain methamphetamine.

26. At the conclusion of the interview, CS2 agreed to cooperate fully in the investigation of HAZZI. Agents then directed CS2 to place a recorded phone call to HAZZI. During the recorded phone call, HAZZI told CS2 that HAZZI needed a key to the storage unit so that if something

8

happened to CS2, HAZZI would be able to repay the debts he owed. CS2 then told HAZZI that the deal with the UC had occurred and that CS2 would be willing to bring the proceeds (cash) to HAZZI at that time. HAZZI instructed CS2 to bring the cash to HAZZI's residence, where CS2 said that HAZZI normally met CS2 to receive narcotics deal proceeds, and CS2 agreed to do so. Approximately an hour and-a-half later, as agents and CS2 were en route to HAZZI's residence, HAZZI called CS2 again. The call was not answered, but a few minutes later, CS2, under the direction of agents, placed another recorded phone call to HAZZI. During the call, HAZZI reiterated that he needed the code and key to the storage unit so that if something happened to CS2, HAZZI would be able to access the storage unit and avoid having a "bounty on my head," in relation to his debtors. HAZZI stated that he paid his debtors a "little bit of money and then they pay me and front me sh*t," and that CS2 had a "lot of people's work in your hands."

27.    At approximately 7:50 p.m., CS2, whom agents had equipped with a covert video and audio monitoring and recording device and whom agents had provided with $10,000 in DEA Official Advanced Funds (OAF) to give to HAZZI as the proceeds of CS2's narcotics transaction with the UC, arrived outside of HAZZI's condominium building at 16699 Collins Ave, Sunny Isles, FL. CS2 then called HAZZI and told HAZZI that CS2 was outside of HAZZI's building. HAZZI instructed CS2 to wait there and told CS2 that HAZZI would drive down from the parking garage within the condominium building to meet CS2 in the parking lot and receive the cash. A few moments later, HAZZI drove out of the parking garage in a white Porsche registered to him, pulled up next to CS2's vehicle, got out of his vehicle, and approached the open passenger side window of CS2's vehicle. CS2 then gave HAZZI the cash, as well as a key to the storage unit at Sentry Self Storage. HAZZI inquired as to how much cash CS2 had given him and what CS2 had sold to the UC, referring at one point to "Addies" (Adderall pills). CS2 replied that there was $10,000 cash there, and that CS2 had sold the UC Addies and "10s," referring to pressed pills resembling Oxycodone 10 mg pills. HAZZI

then reentered his Porsche with the $10,000 in OAF and the Sentry Storage unit key in his possession, at which point agents approached HAZZI's vehicle, took HAZZI into custody, and recovered the $10,000 in OAF and the key.

### Conclusion

28. Therefore, based on the facts and information set forth in this affidavit, I respectfully submit that there is probable cause to believe that on January 31, 2024, February 13, 2024, March 20, 2024, March 22, 2024, April 4, 2024, May 1, 2024, and May 15, 2024, Anwar HAZZI committed the criminal offense of Conspiracy to Distribute a Controlled Substance, fentanyl, cocaine, and methamphetamine, in violation of Title 21, United States Code, Section 846.

FURTHER YOUR AFFIANT SAITH NAUGHT.

BRADLEY FREIMUTH
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn and ~~attested to me telephonically (via facetime)~~ IN MY PRESENCE by the applicant in accordance with the requirements of ~~Fed. R. Crim. P.~~ 4.1 on this 16 day of May 2024.

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: Anwar Hazzi

**Case No**: 24-8226-BER

Count #: 1

Conspiracy to Possess with Intent to Distribute a Controlled Substance (methamphetamine, cocaine, fentanyl)

21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii)
* **Max. Term of Imprisonment:** 40 years
* **Mandatory Min. Term of Imprisonment (if applicable):** 5 Years
* **Max. Supervised Release:** 4 Years to Life
* **Max. Fine:** $5,000,000
* **Special Assessment:** $100

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.